UMG, you can hold on a second and just let them get kind of settled in. All right, sir, we're ready when you are. Good morning, may it please the court. I'm Richard Brophy. I'll be representing Grande Communications in this argument. It's a real pleasure. I need you to use your theater or your recording voice so we can clearly hear you here. It's a real pleasure to be here. I'd like to talk about three topics today. The first of my topics is the decision from the district court to apply the wrong legal standard for contributory infringement liability. The second issue I'd like to discuss today is the district court's decision to allow this case to go to trial despite the plaintiffs presenting evidence of what the songs actually sound like in evidence. And third, I'd like to discuss the application of damages in this case and specifically the district court's decision to allow the recovery of a statutory damage for each song rather than each work. So turning to that first issue, which is the proper standard for contributory infringement liability, the district court in this case concluded and then instructed the jury that Grande, by continuing to provide Internet service to its customers with knowledge that certain of them were using it to copy music, meant that Grande had satisfied the conduct and intent elements for secondary liability or contributory infringement liability. In doing so, the district court ignored clear Supreme Court precedent directly on this issue, indicating that that particular conduct, the continued provision of Internet service, is protected conduct and cannot give rise, standing alone, to liability. There are two key decisions that relate to this, both of them from the Supreme Court. Let me just jump you ahead because of your time. You've got to cover some big issues. Yes, Your Honor. The first argument has two subparts, right? One is, after Grokster and Twitter, there is no such thing as material contribution. That's correct, Your Honor. And that would require us to say Gershwin was wrong, Alcatel's citation of Gershwin is wrong. That would be a categorical win for you. But are you also saying even if there is such a thing as liability, the jury instructions were erroneous? I would respond to that in three ways. Number one, our first position is material contribution should not be in the law of contributory liability. The Grokster case does not include that recitation in its articulation of what constitutes contributory infringement. My second point there is even— That's a negative inference from—of course, you know their argument that Grokster is expanding liability in this area, and you're drawing the inference that it's actually narrowing it. Correct, and in footnote 12 from Grokster, it addresses that issue and affirmatively sets a floor for liability that excludes the record label's interpretation of material— Inducement only. Material contribution, Gershwin's wrong, we'd have to split with the Fourth Circuit. Inducement and encouragement are the two ways to establish it. Okay. Inducement, promoting, encouragement. Exactly right, Your Honor. But if you don't win there, if there is such a thing, or if we don't feel like our law has been superseded, depends on Alcatel, then the instruction was still legally erroneous? That's correct, yes. That's my third point. If I could briefly mention the second one, that is there are worlds in which material contribution can exist but must be read in the context of what Sony and Grokster and Twitter say. Okay. And what that means is there are certain categories of conduct and evidence of intent that can be used as evidence of contributory infringement, material contribution, and certain categories that cannot. And Grokster and Sony and Twitter establish a set of protected conducts and mental intents that cannot be used as evidence to establish contributory infringement liability. So that's number two. In other words, what does it mean to materially contribute? And what evidence is permitted to be used to establish that material contribution? And my assertion is that the staple article rule, which was incorporated from the patent law, clearly states that the actual provision of that product or service is protected conduct that cannot be used to satisfy the elements of conduct or intent. So let's say we see ongoing relationship here, and so I think we're going to get to your third point. Is that right? Yes. So I guess the third point is that ongoing relationship is a different issue in my mind than the third issue we were talking about a moment ago. The third issue is, to be clear, the jury instruction that we were given at the district court level is also wrong because it included additional language about what it means to materially contribute. And in our view, the court took away from the jury any assessment of our intent at all and whether there was actually any conduct, culpable conduct here, and instead made a blanket rule that if you continue to provide service with knowledge that it's being used to infringe, that's liability. That was the Fourth Circuit rule, collapses the fourth element into the third. If willfully blind you, that's intent, provided you continue to give them services. Roughly. The Fourth Circuit rule invokes the simple measures or basic measures test. Yes. But the district court in our case went even further and said, I'm going to tell you, jury, what it means to satisfy the simple measures test. And if someone in ISB continues to provide service, that automatically satisfies simple measures. That's one of the issues we have with the jury instruction. I guess what would help me would be what I know you've preserved your Grokster Twitter objection to the whole line of liability. But if you're obliged to accept it, what is the jury instruction? Yes. Liable if what? Yes. Liable if the plaintiff can demonstrate that the party has taken some other steps over and above simply providing service that constitute evidence of wrongful conduct. Taken some other steps. Not necessarily promoting. Because the reason I'm sure you know it inside and out, you all will, the jury conference moment that seems decisive, you probably know it verbatim, is everyone's arguing about is there an intent standard. And then you remember the district court said, I'd be happy to add quote, but deliberately and intentionally take steps to avoid it. But then you don't embrace that. Now, I admit then the next page the district court drops back to the simple measures instruction, which is slightly phrased differently. But here's the question. If Twitter does require more culpability than pure inaction continued to provide services, doesn't that fourth instruction element give it? I'm a little bit confused. Here in the case, unlike in the Fourth Circuit case where I guess they did terminate 32 or something, here we've got your client's employee Horton testifying whether the jury believed or not, and I know there's some disagreement about it, that there was a sharp change of policy. We suspended immediately people, and then we decided not. Why doesn't that reflect the more culpability that Twitter's looking for? That's my question. I understand now. Thank you. So that all goes to whether or not Grande was exercising its right to use the DMCA safe harbor under Section 512. And that safe harbor, 512L, says the decision to or not to practice that safe harbor may not bear on liability. I understand the 512. I think the 512 is a separate and confusing issue. Yes, it is. And you briefed it wonderfully, which is the nice thing about all the issues. We do have all your briefs. And if I ask too many questions, you may be able to get more time from the presiding judge or not. His call, not mine. But I guess I'm not sure I see that that simple measures fourth instructional element isn't one that helps your client and moves it out of a world of pure inactivity. The way that I would answer that question is as follows. The decisions in Sony and Grokster and Twitter say that there is this protected conduct, and that protected conduct is providing Internet service in this case. And it's still protected conduct even if you know infringing uses are occurring. You're still allowed to provide the service. And even if you know someone's using it to infringe and you fail to take steps to stop that infringement, it's still protected conduct. That's what the Sony safe harbor rule is. That's this whole notion of the staple article. It's creating a safe space for commerce to occur. And the flaw in invoking the simple measures test is that it looks at that conduct, which is intended to be protected, and uses it as the evidence to satisfy the test for liability. That's the problem. Although it could go to the Twitter more culpability because it's not just we continue to provide services. It's we're aware of massive piracy, and we deliberately don't take steps that we once did take to stop it. Twitter deals with that exact issue. We have a social media platform. It knows ISIS representatives are using that platform. It knows exactly what they're doing on that platform. And it does not take steps to stop it. It allows them to continue to access the platform. So there are exact parallels. Twitter isn't a copyright case. Twitter isn't a copyright case, but it draws from the exact same secondary liability common law standards. And if you look at what. What's wrong with the four circuits interpretation of the Gershwin case, which is if you give someone a hammer, you remember this line, right? Yes. If you give them a hammer, you're not eating at a bedding. But if you give them a hammer when you know they're going to go bash in a window, you're aiding and abetting. The issue with that analogy is that it ignores the impersonal and broad nature of the services that are provided here. It's one thing if you give your friend a hammer. It's a different thing if you're Home Depot and you sell hammers. And what Twitter says is. And you get calls saying don't sell to this one person. Even then, even then, if you look at Grokster footnote 12 and Twitter's decision, it says even with knowledge and continued conduct, there is no liability because it's protected. What about continued conduct is when you remove what was preventative? Here's what's circular about that is all you're doing is then starting to do the conduct which is protected conduct. And so in many ways, it's. I've asked you a lot and you have two big other issues and your briefs are excellent. So so you choose what you want to get to. I want to say one more thing about this, if I may. And that is two more things. Passive assistance is a big deal here. Twitter talks about the difference between passive and active assistance. And it makes the point that when you are a Internet service provider or some other provider to the public at large and some portion of that public uses that service to infringe. That doesn't mean that you are intending to assist them. They're merely making use of a service that you provide agnostically to the public at large. And what one of the reasons Twitter court went the way it did is because it found that it was merely passive assistance to assist in that way by providing that platform was not active assistance. I'll move on now. I'll move on. So second issue that I'd like to address is the side by side comparison issue. The Fifth Circuit, the Bridgman case, says unequivocally it is the jury's role to perform the comparison of the original work to the alleged copy to assess whether they are substantially similar. In this case, the plaintiffs, this is the first case I'm aware of where this has happened. This is a sort of drop your ball argument. And it's based on Fifth Circuit precedent. But just because your time can be saved. They did have audible magic, right? Your client, there was forensic evidence that there's side to side. Here's the problem with that. Number one, that forensic evidence didn't resolve the question of what the original song sounds like. So the original songs weren't in evidence. The jury couldn't have heard them. If they were back deliberating and said I want to hear X song, the song that was actually submitted to the copyright office, they were incapable of doing it. So it's their burden to prove substantial similarity. It's their burden to prove it. I think we understand it. That's our precedent. It's just our law. The one key point there, though, is the audible magic forensic solution. There was no answer as to where it got the original songs to do the comparison. Is there anything in the record trial record to show you thought that there were that the rights corp notices were incorrect? There was evidence in the record of that. But to be clear, rights corp is one notice company. Audible magic is a different. And the plaintiffs used audible magic. The problem is there was no record evidence of what songs were input into that system to do the comparison. So even if you're going to accept that a forensic system can replace real assessment from a jury, that forensic data was missing. You've got one minute to fight seven circuits. One minute to fight seven circuits, and I'm going to do it by pointing very clearly to the statute, which says unequivocally in this instance that for purposes of assessing statute. I'm going to accept the nudge. Madam Clerk, give him an additional two minutes. I was going to use it to ask you about the cross appeal, but my learned colleague. No, no, go ahead. I take too much time. No? Well, this is a panel that happens to favor oral argument. The three of us do. So, you know, in this case, it's the law clerk's dream about all this technical audible stuff. So for the benefit of the law clerks and others to understand all this. But on a serious note, I'm going to give you two in addition to what you had. And we'll put it on the other side. You don't have to use it, but this is why oral argument is valuable to us to answer the questions. We're going to read it all, but understanding all this is good. So go for it. Thank you. I know this is a big burden. The statute very plainly says. I give him two plus. You're adding him two plus. He had a minute and something, didn't he? Yeah. All right. I can probably finish up in a minute or two anyway. Go ahead. You're good. The issue here, I know there are seven circuits that go the other way on this damages issue. Frankly, those circuits just don't like what the statute says and are ignoring it. The statute says unequivocally that when you register a work as a compilation, you're entitled to one statutory damage, period. And in this case, the district court allowed the plaintiff to recover multiple statutory damages for individual registered works. The statute says you can't do that. The legislative history backing up the statute says you can't do that. There is no rational explanation for how this has happened in these other circuits other than they've simply ignored what the statute says. There are many things about the copyright law that are unclear. This statute, 504C1, is crystal clear, and the court should follow the statute. One work, right? One work. One compilation. One work equals one work. That's your theory. That's exactly right, Your Honor. Yes. How would you be able to protect individual songs as well as the album? You can either register them separately or you can register them as a compilation, and they're all still protected and registered. It just means that you get one statutory work, the exceptional remedy of that damage. You're telling us that would be 662 incidents? That's correct, Your Honor, yes. Did you tell the grand district court that? We were not given the opportunity. The district court entered judgment in the plaintiff's favor on the number of works in suit for purposes of establishing statutory damages. Thank you very much for your time. Tell me. Yeah, I gave you the two, so . . . I'm all yours. No, just you have your conditional cross appeal, so just I read it, but so I guess that's assuming you lose on this contributory issue, so just explain your conditional cross appeal. Our position in response to the plaintiff's on that? Did I get it wrong? That's their issue, Your Honor. Okay, sorry about that. Sorry, sorry, sorry. I'm happy to speak on it, but I think . . . No, no, no. Well, you'll get a chance to come back and say something, but he'll do it. But I guess I'll just end with this to understand. On the first issue about the material contribution, et cetera, so when you lose on that issue, you know, we don't agree with the major issue. He should have just stopped this at the past, King's Act, end of story, but assuming you lose on that major piece and then we end up in the rest of this, sort of kind of where are you? I mean, you're not riding in solely on that argument, although it's a big piece of what you argued, but I guess you allow for the possibility that you could lose on that issue about material contribution, right? If we lose, there are various ways in which the court can handle this issue. Okay, well, that's kind of what my question is. Yes, so one way is . . . I'll go from bottom to top. One way is we lose on everything and you decide that the jury instruction was correct as written. The second option is that you decide that material contribution should be included in the instruction and that the Fourth and Ninth Circuit's interpretation of that, that being the simple measures, is correct. Then we should go back to the district court with an instruction that simply includes material contribution. You could also agree with us that material contribution should be in the instruction, but it must be limited by the staple article rule, which means that only certain evidence and not the protected conduct that is defined by the staple article rule, only certain other evidence can be used to establish culpability there. That would be evidence that we advertised that you could come to us to infringe or that we're going to make downloading songs as fast as possible on our service, those kinds of plus-up factors. You could remand us to the district court with an instruction that includes material contribution in the language, but clarifies that the type of evidence that can be used to establish contributory infringement does not include the activities that are protected conduct by the Sony staple article rule, which includes providing that Internet service. And then, of course, the best for us would be you decide that material contribution is not in the law, that the Supreme Court does not allow that, and that because the only evidence the record labels had at trial about our malfeasance was the continued provision of Internet service. If you find that that's protected conduct, there is no other evidence, and you should enter judgment in our favor on this issue. All right. All right. Thank you for that good summary to just sort of loop it all in. And, of course, you've preserved your rebuttal time, but I wanted to make sure on your initial argument kind of had it sort out. All right. I appreciate your patience. All right. Thank you, Mr. Bart, for being patient. Sorry I made the miscue about the cross-appeal. Thank you, Your Honors. May it please the Court, my name is Andrew Bart. I have the privilege of representing the major record labels on this appeal. This case is really a very simple case and one that focuses on something that is completely different from what you've just been hearing about. This case is not about the passive provision of Internet services. It's about the affirmative decision by the defendant in this case to change its policy to look the other way when it had specific knowledge of infringement by specific users, and then to provide those very users that it had knowledge of with the very mechanism and tool that they needed to continue to infringe. All of the cases that they talk about, there was no nexus between the provision of service and the tort that was being committed. There's so much reliance in this case on the Twitter case. Not only is the Twitter case not addressing copyright, as Your Honor identified a few minutes ago, but the real point there was there was no nexus between the terrorist act that was at issue and the fact that the terrorists were allowed to use social media. Yes, they were on social media, but there was no assertion that the use of the social media in any way furthered that terrorist attack. And so there was direct conversation in the decision about the lack of a direct nexus, and it was specifically stated at the end of the decision... I guess two quick questions. Sure. The Fourth Circuit seemed to say willful blindness is equivalent to intent to cause infringement. Mm-hmm. Didn't that end up... In other words, if the Fourth Circuit's wrong, this case has to get overturned, or was the jury told they have to find something that he's calling the plus-up, a plus-up factor? Well, I don't think that we agree that it is just based on that. We're saying there was... I know factually there was a lot more, I agree. There was a lot more. Yes, there was, but was the jury required to find a lot more, or was the jury told that fourth element doesn't really exist, it's part of the third, if willful blindness, then intent? Well, in this case, there was actual knowledge as well as willful blindness. Okay, but even that, let's assume... I mean, my view, I can be disabused of it, is not only knowledge but willful blindness. But the problem comes at that charge conference I'm talking about, about what was the jury told that they had to do extra, find extra, or do you not think there is any extra? Well, I mean, they certainly were required to say, to find the elements of material contribution and to also find, in addition, that there were simple measures that the defendant could have taken to avoid this action going forward. And that, interestingly, is a standard that favors the defendant, adds another burden, and just out of curiosity, in the Cox case, in the Fourth Circuit case, when they filed their motion to stay the mandate, they argued to the Fourth Circuit that there was error because there was no simple measures instruction, because that was something that would have favored them because it was an extra protection for the defendant. So this whole simple measures argument seems like a get-out-of-jail card for the defendants in these cases. And yet the actual version of it that was given is still phrased in the negative. Yes, but... In other words, and so the tension with Grokster and Twitter is a real one, and I'll just quote the two lines that you know exist. In Grokster, the Supreme Court says, mere failure to take affirmative steps to prevent infringing does not establish contributory negligence in the absence of other evidence. And then you get Twitter, and the phrase that I'm worried about is, a communication provider is not liable under sort of aiding and abetting merely for allowing knowing wrongdoers to continue using the service and failing to stop them. Okay, the most important thing with regard to Twitter, again, and this is taken out of context repeatedly in Appellant's brief, is that it's not, there is no duty, I agree with them, there is no generalized duty to stop wrongdoing on the service. Okay, so they are a common carrier in many ways, and so the mere fact that there is wrongdoing happening on the Internet, happening on a social media platform, Twitter is right, the cases are right, you need something more than that. What you have that is more than that here is, they have knowledge that particular people, particular subscribers, are infringing, and they nonetheless provide those people, not the public writ large, you look at the quotes that they talk about, there's no liability for providing the service to the public writ large. But it's the same service, it's high-speed Internet. Well, of course it's the same service, but they're not, the wrongdoing is not that they are providing it to the world, but once they have knowledge, once they have specific knowledge, that these particular people are using that service for wrongdoing, they may not continue to provide. That's the whole purpose of sending the notices. Okay, so that nexus argument, then, what's the limiting principle? Because, as they point out in their reply brief, there are other actors that, therefore, if Rights Corp were sending notices to the software, the BitTorrent software people, saying people are using this to infringe. There is no BitTorrent software. Okay, but you understand my point. The whole chain of all the actors that are assisting with tools, if they were on notice, would they be secondarily liable? There's a very critical difference here that involves ISPs, and I think this requires us to take a step back. BitTorrent infringement is anonymous infringement. Infringement has morphed and evolved over the years from what started out as Napster, where you had a center organization and you could sue Napster. Then you had Grokster. Grokster was not a central organization. They just distributed software, so they were outside the loop of the action. BitTorrent goes even further than that. BitTorrent has the, nobody knows, I was exchanging this material. So you can have investigators going out and finding these acts, engaging in getting agreements from users to distribute illegally. The only party in the world that can tie together that evidence with the actual infringer is the ISP. The ISP, because you identify through the IP address. If you tell the ISP, here are the ISP addresses, these are the people that you can't go forward, and the ISP says, you know what? We're not going to look at anything. We're not, for seven years, if we get notices, they're going out the window. We're not doing anything. It becomes the Wild West, and millions if not billions of infringements take place, and they are the only ones that are in a position to do that. That is a strong policy argument that they're unique. But what's the element that required, that the jury had to find? Material contribution. And material contribution can exist solely when they're willfully blind. Yes? It can, yes. Willfully blind to ongoing specific copyright infringements, okay? And that is the missing link here between all these examples of staple product, okay? This is not just a matter of providing product to the public at large. It's a matter of providing it to the very people that are using it to infringe. And I want to go back to one other thing, because there's been a sort of backhand gloss at the DMCA here. We concede that we were required by the law and by the DMCA to prove the elements of our case, and that's why we had a trial. We had to prove that they were actually direct infringements. We had to prove that the direct infringements were. . . That's right. That's right. And we proved that, right? So the jury found, yes, there were specific infringements. The rights court data proved that. The downloads proved it. And, you know, moreover, they knew about it. So we proved knowledge. We proved direct infringements. They were only in the area of material contribution. That really wasn't much of a dispute at the trial, because there's no real argument that they had the knowledge as to who the infringers were and just looked the other way for seven years. The testimony was overwhelming. They said that. . . I'm just going to. . . You don't need to recite the testimony for me. I do know the testimony, and the jury made its verdict. I'm just zeroing in on is there no fourth element? Is there no intentionality element? Well, there is. Or can it be met by willful blindness alone? Well, willful blindness or intentional provision. I mean, this was. . . Intentional provision of what? Of Internet service to those people they knew were infringing. I am limiting my arguments only to the people who Grande knew were infringing. I reject the notion that this case is at all about the provision of Internet services generally. If Grande is operating and nobody notifies them of anything, they're not going to have liability under these grounds because they're not going to have knowledge of the underlying infringements. But here they have knowledge of the underlying infringements. They know who they relate to. They get roll-up reports saying who they are. So are you saying that you win even under Twitter? Oh, absolutely. Absolutely. To me, Twitter. . . And it goes on to say this in the. . . I was trying to. . . Because that shows purposeful. . . It shows a direct nexus between the use of the instrumentality and the underlying tort. And the court specifically said that once you have that direct nexus, it is much easier for the court to find, in this case, aiding and abetting liability. These are adjoining areas of the law. And while I do believe that the Supreme Court had no intention in ruling on an aiding and abetting statute to nullify law in the copyright area without saying so, I think that the results are harmonious. And I think that they're basically focusing on the same thing. What I'm saying about material contribution is the same thing I'm saying about direct nexus. In order for there to be a liability, there needs to be a connection between the acts of grande and the actual wrongdoing that's taking place. And the jury was told it had to find the nexus? Huh? The jury was told it had to find this critical nexus you're describing? The jury was told that it had to find that there were simple measures to remove. So it is. The critical nexus argument you're making powerfully inhabits that fourth simple measures gloss. Well, yes, because the simple measures is sort of the flip side of the same coin. It's basically saying— It is. I see that. But then his response is that's undoing the safe harbor what I'll call clawback, that that's turning these policies into a sword against them. Well, but the problem is that they're trying to take the DMCA provision, 512L, and say that we can ignore the DMCA altogether. The fact is, and this is really an important point, the DMCA was negotiated because in the 1990s there were a whole series of cases holding ISPs liable for the infringements of their subscribers. So there was a congressional negotiation which led to a balancing. The ISPs were arguing for some degree of immunity. We know that. So that balancing is— Here's a softball question, but be careful before you answer it. Is all of this discussion somewhat academic because we are bound by Alcatel? Well, I think that you are. I think you were right in Alcatel. I mean, you have the power as an appellate. As a panel? Well, okay. That's my question. No, I think that Alcatel is the law of the Fifth Circuit, but I also think that it is the law of every circuit. Not only I think, I know that there has never been a case anywhere, not the Supreme Court in Grokster, not the Supreme Court in Sony, not the Supreme Court in Twitter, that has ever said, you know what? Material contribution is not a standard for secondary law. Your friend opposing did point to footnote 12 in Grokster. But it doesn't say that. Read footnote 12. Well, you tell me again what it says. Well, footnote 12 is, let me grab it. No, no, no, that's all right. I'll read it. But he's, I mean, I think there's a reference to Gershwin, correct? Well, there are a lot of things that are in there. But, you know, they cite Gershwin. They only refer to the particular part of Gershwin in a separate point because it's an inducement case. And there's no continuous involvement. Remember that in Sony, Sony wouldn't have satisfied the Gershwin standard because they had no knowledge of specific infringements, right? Grokster would have been in the same boat. You have two big other issues that he highlighted. Fifth Circuit authority, the sort of unique situation that you had to have put in side-to-side evidence yourself, your burden to prove substantial similarity. Yep. Can I just finish one last thing on the DMCA? Of course, your choice. So the DMCA, therefore, was a balancing of the interests of the ISPs and of the content owners. What they are asking for right now is a judicial veto of the DMCA because if they are right, if they, as a social media or an Internet company, are inherently not liable, then nobody needs to seek a safe harbor. They can just simply say, we have a staple product. I'll ask them that in rebuttal. Okay. You're saying, is it making it superfluous? Well, it absolutely is making it superfluous. Okay, fair enough. So with regard to the side-by-side, this is, A, obviously a gotcha argument, but more importantly, one without substance because in cases like this, as in the escape media case that we cited to this court, when you're dealing with thousands of recordings, you're not going to have a side-by-side comparison where the jury is going to put down a needle on a phonograph and listen to this and listen to that. Moreover, this isn't a case that really involves substantial similarity. This is a case that involves mechanical copying. The works are the same works. We are not going through a provision where it's saying, you know, I don't think the works are quite similar enough. Some have some variations. Is this actionable or not? These are mechanical copies, and they have been forensically tested by a service that has a reliability that is really beyond question and has been used in major digital copyright cases for decades now. And I think that the cases that come from this circuit deal with circumstances where there was no evidence but the plaintiff's oral testimony of, I listened to these things and they are the same. And that's not what we have here. We have the defendants and the jury had the source code for Audible Magic. It had its output reports for every one of the songs that were here. We also played for the jury 50 back-to-back songs just so they could hear them. There was never any doubt in anyone's mind that every single one of these songs was the same. They never came up with any examples in which they were the same. Let's move to 504. In 504, yes, is a compilation a work? Yes. But there's nothing in that definition that precludes an individual track from also being a work if it's exploited separately. And the registrations themselves are not the determinative fact of what is a work in terms of the actual use of a song. The registrations are prima facie evidence. But the phrase is one work. Yes, if it is a compilation. And a compilation is one work. Okay, and to the extent that it is being used as a compilation, there's one case that they cite from the District of Arizona, I believe, in which there were photographs that were only exploited collectively as a compilation and there was one award. And we wouldn't argue with that, okay? But what we are saying is that when something is registered as a compilation, but nonetheless every one of the works in that compilation is separately exploited so that they have independent economic lives. You're going that route, not the Second Circuit route. You're saying it's this independent economic value? Well, that's what the Second Circuit does too. So you think all seven circuits are stating that? Yeah, I do. I think they're looking at is there independent economic value for each of the tracks so it makes it the proper result that each of them is a work for exploitation. And I think this becomes a much more important point in the modern era when songs are exploited individually. I agree it's an important point, and there's a powerful equitable appeal. Isn't that argument one to make to Congress? Well, I don't think it's necessary because everybody recognizes that the term work itself is not defined and that the works and that registration. A compilation is defined as a work. Okay, a compilation is a work, but it doesn't have the other. And then you get damages for only one work. If it is exploited in the context of a compilation. But the mere fact that a compilation is defined as a work doesn't contain the other half. All the circuits agree with you. And every one of the circuits agrees. Cross appeal. Huh? Cross appeal. Okay, well, the cross appeal is that under the great weight of authority, the making available of a track is sufficient to violate the distribution right. And that's what took place here, and the judge on summary judgment found that that was, in fact, the majority rule. But when it came time to instruct the jury, said that you need to actually show actual distribution, although the offering to make copies available is circumstantial evidence that could be used. And we think that in this context, once you have made the work available, you are violating the distribution right. The majority of the case law that interprets this, interprets it that way. The cases have been presented to the court, and I don't think that it's necessary. Do you know in the child pornography area, is just putting it up and making it available considered to be a crime of distribution? Yes. And I think that in general it is, because what happens is these are anonymous platforms, right? And so if I am a BitTorrent user, and I open up my computer, and I have all of these songs, people just go through the Internet and take and copy, and it's invisible to the world who's doing what. But in order to police it, you have to know who are the people that are putting it out there. And I think that the law is very well stated. I think the most important thing that I'd like to close with in 20 seconds is that you're dealing with a company that has clearly just made the conscious decision, we're not going to do anything, we're going to put all the costs on the copyright owners. If they lose money, so be it. If we have our rights violated, if they're not paying our fees, we'll terminate users freely, and we do it in 100% of cases. But with your people, we want their money, we want their monthly fees, and we're going to look the other way, and then we're going to try and argue that we're just a mere provider. But they're not a mere provider once they have notice. Once they have notice, and it's specific, and the jury found that these infringements happened, and they were then aware of it, they're outside the scope of all the case law that they're looking for. Not a single case has held that that is somehow protectable. They're arguing from quotations and inferences and not from any holdings, and they would require you to reverse material contribution as a form of the law, and no court has said that, upend the DMCA and wind up with a result in which copyright owners are left completely helpless in this environment. Thank you, Your Honor. All right. Thank you, sir. All right. Back to you, Mr. Brophy. I'm going to hold you to the seconds of your five minutes. Understood, Your Honor. Thank you. I want to make just a couple of quick points. Number one, I would like to direct your attention to some very important language in Twitter. On page 503 of the Twitter decision, it says, the fact that some bad actors, in this case ISIS, took advantage of these platforms is insufficient to state a claim that defendants knowingly gave substantial assistance and thereby aided and abetted those wrongdoers' acts. And that is particularly true because a contrary holding would effectively hold any sort of communication provider, like Rondae, liable for any sort of wrongdoing merely for knowing that the wrongdoers were using its services and failing to stop them. That conclusion would run roughshod over the typical limits on tort liability and take aiding and abetting far beyond its essential culpability warnings. That is exactly what's going on here. We have not done anything other than provide passive assistance in the Twitter context. That means we provide a staple product to the entire public at large, and the fact that some people chose to use that service for illicit means does not make us culpable for that product. Even with a million notices that these are the very people, some of them tens of thousands of times. This is the problem. And the response is to not terminate or suspend, and yet you do it immediately when you're not paid by the subscriber. And we turn them right back on when they do pay. Okay, maybe turn it on once they pay the $30 to the creator, the songwriter. The record labels have argued that once termination occurs, it can never be undone. So the real issue here, though, is that what is going on is... Of course, Twitter is in the Terrorism Act context. It's talking about tort liability. But is the court really saying this is a huge... We're revising everything that we've said in the copyright world? They're not. They're saying things that exactly align with what was said in Sony and Grok's. Okay, so that's your first point. But you're going to answer the question I told you I was going to ask, right? I sure am, yes. If I can remember what it was. Have you rendered the DMCA safe harbor provision? The answer is absolutely not. The DMCA safe harbor provision provides absolute certainty for a corporation. And if you read Sony and Grokster, it talks about this need to balance between the interests of good commerce and enforcing artistic expression. That's what the staple article rule does, is it creates that bright line rule. The real issue here is, is a party permitted to reach over that bright line and use evidence that is within the protected class of conduct to establish liability. I guess I don't understand the protected class. If Horton said you took barriers away, that's not having policies to protect against infringement. That's removing policies. But all we're doing is removing a policy and therefore providing the very same service that the staple article rule says we're allowed to provide. That's the issue here. And what Twitter says and what Grokster says is there needs to be some culpable conduct over and above the mere provision of that service. Put differently, you get a free pass for doing business. If our business is internet service, we can't suddenly be found to intend to cause patent infringement by simply doing our business. That's what the staple article rule protects. And to answer your specific question about the safe harbor, and this I think also addresses one of the problems with the jury instruction, there is a spectrum of conduct past permanently terminating a subscriber that would still show that we did not intend to encourage infringement. We could send notices to our customers saying, please stop. We could provide a call center that allows people to call in and get educated on how to remove the software that their teenager's installed or to secure their Wi-Fi so someone can't use their internet connection illegally to conduct these bad acts. That would all very clearly show a lack of intent to cause infringement. It's something shy of terminating their service, absolutely, but it still shows a lack of culpable intent. And so the DMCA safe harbor gives you certainty. But that doesn't mean that if we fail to comply with that, we're automatically liable. You have to look at our intentions. And if our intentions are nothing more than providing a service. The jurors did look at your intent. The jurors looked at our intent through the lens of an instruction that said, the mere fact that we continue providing the service equals liability. I don't find that challenge here. The other thing that I would say, I guess I want to address Alcatel quick though. Well, no, to answer his question, he said the instructions weren't challenged here. The instructions absolutely were challenged, Your Honor. I should have said meaningfully. I see. All I can say is simple measures test is nowhere in the law. And I'll blend these two. You wanted me to address the Alcatel decision. You can be bound by Alcatel and still interpret material contribution in a way that complies with the Supreme Court's precedent on the staple article rule. So just because material contribution exists as a line item, doesn't mean it brings with it all this simple measures test. Induce or blah. Or materially contribute. But that doesn't mean that you have to import the rest of the law from the Fourth and Ninth Circuits saying that. All right, I'm going to rope you in, Mr. Brokaw. I have a feeling you could go on exponentially. That's true. I mean, it's a big case and all that. But in any event, it's a three-week jury trial. From my ears, a jury trial is a jury trial. So we're going to look at the record closely. I hear what you're saying about that charge. But it's a jury case, and there's some point at which credibility gets judged and actual knowledge gets judged and so on and so forth and all that. So we've got your legal arguments, but it's not lost on us. It's a jury trial. So we're going to look at it from that standpoint. So we appreciate the hefty briefing by both sides in this matter. I think we've got the arguments. Your answers have been very, very helpful. But in the end, we'll dig deeply into it, and at some point we'll decide all the issues. Thank you. Thank you very much for your time. All right.